# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| DORCUS WITHERS, | ) |
|     Plaintiff, | ) |
| | )    13 C 1643 |
| v. | ) |
| | )    Judge Jorge L. Alonso |
| DR. CARTER, DR. DUBRICK, and DR. KELLY, | ) |
|     Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff sues defendants pursuant to 42 U.S.C. § 1983 for their alleged violation of his Eighth Amendment rights. The case is before the Court on defendants' motion for summary judgment and plaintiff's motion to reconsider the denial of his motion to file a third amended complaint. For the reasons set forth below, the Court denies the motion to reconsider and grants the motion for summary judgment.

## Motion to Reconsider

On June 17, 2015, more than two years after he filed this suit and less than one month before summary judgment motions were due, plaintiff filed a motion for leave to amend his complaint "to include new allegations and a defendant, Wexford Health Sources, Inc." (*See* Mot. Leave Am. Compl. ¶ 6.) The motion was prompted, plaintiff said, by facts he had recently "discovered . . . while taking the defendant doctors [sic] depositions." (*Id.* ¶¶ 6, 11.) Those facts were that: (1) "Wexford at all times relevant to this matter had a contract with the Illinois Department of Corrections to provide medical services to its prisoners, including Mr. Withers"; and (2) "The Defendant doctors that were deliberately indifferent to Mr. Withers' medical needs were all

employees of Wexford." (*Id.* ¶¶ 7-8.) The Court denied the motion because the record revealed that plaintiff knew these facts long before he deposed defendants. (*See* 7/9/15 Order.)

Plaintiff now says that his motion to amend was not based on his recent discovery that defendants were employed by Wexford and Wexford by IDOC. (*See* Mot. Reconsider ¶ 9.) Rather, he says, it was based on his recent discovery that Wexford has "policies [that] led to his injuries." (*Id.*) Plaintiff's argument, however, is belied by the clear language of the motion itself, which cites his discovery of the employment relationships among defendants, Wexford and IDOC, but says nothing about Wexford's policies. Because the Court did not, as plaintiff asserts, "mistakenly overlook[] key facts" (*id.*) when it denied plaintiff's motion for leave to amend, there is no basis for reconsidering that decision.

**Motion for Summary Judgment**

**Facts**[1]

Plaintiff is an inmate housed in the Illinois Department of Corrections' ("IDOC's") Stateville facility. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 3.) Defendants Carter, Kelly and Dubrick are doctors who, at the times relevant to this suit, worked at Stateville. (*Id.* ¶¶ 4-6.)

On May 19, 2011, plaintiff told prison staff that he was having difficulty urinating and had had a prolonged erection. (Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 6.) He was taken to the emergency room at St. Joseph Hospital, where it was determined that the priapism, *i.e.*, prolonged erection, had resolved and was a side effect of Trazodone, a drug plaintiff took for depression. (*See* Pl.'s Ex. B, St. Joseph Med. Records at 11-12.) The St. Joseph doctors recommended that plaintiff stop taking

---

[1]Unless noted otherwise, the following facts are undisputed.

Trazodone, a recommendation the Stateville doctors followed. (*Id.* at 12; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 9.)

In 2011, Carter, Kelly, and Dubrick knew that priapism is a sometimes painful condition in which patients maintain full erections for a prolonged period of time in the absence of sexual stimulation. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 19.)[2] They also knew that ischemic priapism, *i.e.*, priapism caused by a blockage that prevents blood from flowing away from the penis, is a condition requiring immediate medical attention. (*Id.*) Cyanosis, or blue discoloration of the skin, is consistent with ischemic priapism. (*Id.*) Though priapism can also be non-ischemic (*id.*), there is no evidence in the record about the difference, if any, in symptoms and treatment for non-ischemic priapism.

On August 26, 2011, plaintiff was examined by a non-party psychiatrist, Dr. Kartan, who, at plaintiff's request, prescribed Trazodone for him. (*See* Pl.'s Ex. E, 8/26/11 Prescription Order; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 31.) When plaintiff saw defendant Kelly on September 28, 2011 and October 19, 2011, plaintiff said he wanted to continue his current regimen of medications and made no complaints of priapism. (*See* Pl.'s Ex. F, 9/28/11 Treatment Notes; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 32-33.) Kelly allowed him to stay on Trazodone. (*Id.*)

On November 14, 2011 at 8:00 p.m., plaintiff told a Stateville nurse that he had had a painful erection for "about 7 hours" and was having difficulty urinating. (*See* Pl.'s Ex. I, 11/14/11 Progress Notes.) The notes state "erection verified – no redness, cyanosis, or discharge noted." (*Id.*) Carter instructed the nurse to give plaintiff Valium, a drug used "[to] relax muscles or relieve muscle

---

[2]Plaintiff denies in part the facts asserted in this paragraph but does not support the denial with citations to the record. Therefore, the Court deems him to have admitted these facts. *See* LR 56.1(b).

3

spasm,"[3] and Hytrin, a drug used "to treat high blood pressure,"[4] and to observe plaintiff for two hours. (*Id.*) Plaintiff's condition did not change over the next two hours, so Carter admitted him to the infirmary for twenty-three hours' observation and made a "[m]ental health referral for d/c [discontinuation of] trazodone." (*Id.*)

On November 15, 2011 at 12:30 a.m., a nurse noted that plaintiff's penis "appear[ed] approximately 50% [erect] without signs of discharge, redness, or cyanosis." (Pl.'s Ex. J, 11/15/11 Progress Notes.) At 7:00 a.m., Dr. Carter examined plaintiff and noted: "Penis only minimally engorged. No true erection." (Pl.'s Ex. K, 11/15/11 Progress Notes.) Carter concluded that plaintiff's condition was "[p]ossibly drug related" and referred him to mental health for "drug review." (*Id.*; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 38.) At 1:30 p.m., plaintiff was discharged from the infirmary. (Pl.'s Ex. K, 11/15/11 Progress Notes.) At 7:50 p.m., Kelly wrote an order discontinuing plaintiff's Trazodone. (Def.'s Ex. F, Med. Records at 55.)

On November 16, 2011 at 9:20 a.m., plaintiff told a nurse that he was bleeding from his penis, but she noted "no current bleeding." (Pl.'s Ex. L, 11/16/11 Progress Notes.) At 3:45 a.m., plaintiff was taken to the medical unit complaining of bleeding from his penis, though the nurse stated "no bleeding noted at this time." (Pl.'s Ex. M, 1/16/11 Progress Notes.) Carter instructed the nurse to give plaintiff Valium and Hytrin and admit him to the infirmary to monitor for bleeding. (*Id.*) Later in the day, a nurse made the following note: "Blood stains noted to front of undershorts. Penis remains erect. Sm. drop of blood noted to tip." (Pl.'s Ex. N, 11/16/11 Progress Notes.) Her

---

[3] *See* http://www.mayoclinic.org/drugs-supplements/diazepam-oral-route/description/drg-20072333.

[4] *See* http://www.mayoclinic.org/drugs-supplements/terazosin-oral-route/description/drg-20066315.

assessment was: "Risk for injury secondary to priapism." (*Id.*)  Subsequently, defendant Dubrick examined plaintiff and noted: "Penis is semi-engorged but not erect nor upright.  Soft to squeeze.  Urethral opening inflamed with 2-3 mm tender nonpurulent ulcer on lateral margin." (Pl.'s Ex. O, 11/16/11 Progress Notes.)  Dubrick ordered STD tests, which were negative, and an x-ray, which showed that there was no foreign body in plaintiff's penis, and ordered that all of his psychotropic medications be discontinued. (Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 24; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 44.)

On November 17, 2011, Dubrick examined plaintiff, who told Dubrick the "erection [was] diminishing slowly." (PL.'s Ex. Q, 11/17/ Progress Notes.)  Dubrick prescribed antibiotic ointment for the sore on plaintiff's penis and instructed him to report "new priapism to MD." (*Id.*)

On November 22, 2011, Dubrick examined plaintiff again and noted: "Semi erect status unchanged.  Penile ulcer looks more inflamed but not purulent." (Pl.'s Ex. S, 11/22/11 Progress Notes.)  Dubrick assessed plaintiff as having "Urethritis + Priapism." (*Id.*)

On November 29, 2011, Dubrick again examined plaintiff and noted: "Soft, semi-erect penis, tender to touch [or] movement." (Pl.'s Ex. T, 11/29/11 Progress Notes.)

On December 3, 2011, plaintiff told a corrections medical technician ("CMT") that he was bleeding from his penis. (Pl.'s Ex. U, 12/3/11 Progress Notes.)  The CMT said "[o]ld frank [*i.e.*, "clinically evident," *see* http://www.merriam-webster.com/medical/frank,] blood seen on [plaintiff's] boxers. [Plaintiff] is not currently bleeding from penis. [Plaintiff] denies pain at this time. [Plaintiff] is not currently dripping blood after urination. [No] blood noted in [plaintiff's] toilet." (*Id.*)  The CMT put plaintiff on sick call for further evaluation. (*Id.*)

5

On December 4, 2011, plaintiff complained that he was bleeding from his penis. (Pl.'s Ex. W, 12/5/11 Progress Notes.) The nurse noted that he had a tear on the opening of his urethra and, at Carter's instruction, gave him antibiotic ointment and gauze. (*Id.*)

Plaintiff still suffers intermittently from prolonged erections and has pain when he ejaculates. (Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 37.)

## Discussion

To prevail on a summary judgment motion, "the movant [must] show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At this stage, we do not weigh evidence or determine the truth of the matters asserted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). We view all evidence and draw all inferences in favor of the non-moving party. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Summary judgment is appropriate only when the record as a whole establishes that no reasonable jury could find for the non-moving party. *Id.*

To defeat defendants' motion on his Eighth Amendment claims, plaintiff must allege that each defendant was deliberately indifferent to his objectively serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "An objectively serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001) (per curiam) (quotations omitted). A defendant acted with deliberate indifference if "[he] was subjectively aware of the prisoner's serious medical needs and disregarded an excessive risk that a lack of treatment posed to the prisoner's health or safety." *Id.*

6

Defendants contend there is no evidence that plaintiff's priapism was an objectively serious medical condition. The Court disagrees. Viewed favorably to plaintiff, the record shows that the priapism caused plaintiff significant pain, and defendants deemed the condition serious enough to warrant sending him to a hospital emergency room, giving him Valium and Hytrin, and admitting him to the infirmary. That is sufficient to suggest that plaintiff's priapism was an objectively serious medical condition. *Wynn*, 251 F.3d at 593; *see Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997) (stating that an objectively serious medical condition might be indicated by "'[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain'") (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992)).

Plaintiff contends that Carter and Dubrick were deliberately indifferent because they did not immediately send him to a hospital in November 2011 for treatment. It is undisputed that ischemic priapism is a painful, full erection that lasts at least four hours, is accompanied by cyanosis and requires immediate medical attention. (*See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 19;[5] Defs.' Ex. E, Kelly Dep. at 39-41, 73; Defs.' Ex. G, Dubrick Dep. at 19-20.)[6] Viewed favorably to plaintiff, the record suggests that he had an erection that lasted more than four hours. (*See* Pl.'s Ex. I, 11/14/11 Progress Notes (stating that plaintiff reported a seven-hour erection).) But there is no evidence that suggests his penis was ever cyanotic, and thus that he suffered from ischemic priapism. (*See id.* ("erection

---

[5]*See* n.2.

[6]Defendants' testimony is the only admissible evidence about priapism because the only evidence plaintiff submits on the subject, three medical articles (*see* Pl.'s Exs. Z, AA & BB), is inadmissible hearsay.

verified, no redness, cyanosis, or discharge noted"); Pl.'s Ex. J, 11/15/11 Progress Notes (stating that there was no "sign[] of discharge, redness, or cyanosis").) Because the record suggests that plaintiff had non-ischemic priapism, and it does not suggest that that condition is a medical emergency, Carter and Dubrick's failure to send plaintiff to the hospital does not evidence deliberate indifference.

Alternatively, plaintiff argues that Carter and Dubrick were deliberately indifferent when they failed to send him to the hospital "as [his] symptoms worsened." (Pl.'s Resp. Mot. Summ. J. at 10.) Specifically, plaintiff says that defendants should have sent him to a specialist once he started bleeding from his penis. However, the assumption underlying plaintiff's argument, that the bleeding was a symptom or result of priapism, is not supported by the record. There is no evidence that bleeding is associated with priapism or that there is a causal relationship between priapism and the sore plaintiff developed on his penis. (*See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 22.)[7] Absent such evidence, no inference of deliberate indifference can be drawn.

With respect to Kelly, the record suggests that he knew plaintiff had experienced priapism in May 2011 from taking Trazodone, he knew Dr. Kartan prescribed Trazodone for plaintiff on August 28, 2011, and he allowed plaintiff to take the drug from August 28, 2011 until November 15, 2011. (*See* Pl.'s Ex. F, 9/28/11 Treatment Notes; Pl.'s Ex. G, 10/19/11 Treatment Notes; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 31-33; Pl.'s LR 56.1(b)(3)(C) ¶ 15.) It is undisputed, however, that: (1) some patients who use Trazodone and get erections as a side effect tolerate that side effect to get the benefit of the medication; (2) plaintiff, knowing that the medication previously had given him

---

[7]Plaintiff did not respond to this fact statement, and thus is deemed to have admitted it. *See* LR 56.1(b).

priapism, asked Dr. Kartan to prescribe it for him in August 2011; (3) plaintiff asked Kelly to let him stay on Trazodone and Kelly's notes state that plaintiff gave his "voluntary informed consent" to do so; (4) plaintiff did not complain of priapism to Kelly; and (5) Kelly did not know plaintiff had the condition until November 15, 2011, at which point he immediately ordered that the Trazodone be discontinued. (*See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 21, 31-33; Pl.'s Ex. F, 9/28/11 Treatment Notes; Defs.' Ex. F, Med. Records at 55.) Taken together, the evidence simply does not support the inference that Kelly acted with deliberate indifference.

## Conclusion

For the reasons set forth above, the Court denies plaintiff's motion to reconsider [67] and grants defendants' motion for summary judgment [73]. This case is terminated.

**SO ORDERED.**          **ENTERED: October 8, 2015**

_____
**HON. JORGE L. ALONSO**
**United States District Judge**